**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHERI MICHELLE EDENS,**
**and other persons similarly situated,**

**Plaintiff,**

v.                                                    Civil Action No. **2:22-cv-00101**

**CEBRIDGE ACQUISITION, LLC,**
**CEQUEL III COMMUNICATIONS I, LLC,**
**CEQUEL III COMMUNICATIONS II, LLC,**
**& ALTICE USA,**

**Defendants.**

## <u>AMENDED COMPLAINT</u>

Plaintiff, on behalf of herself and all others similarly situated (the "Class" as defined below), by counsel The Webb Law Centre, PLLC, Taylor Conway Price PLLC, and TFPC, a Maine Professional Corporation, alleges the following against Cebridge Acquisition, LLC, Cequel III Communications I, LLC, and Cequel III Communications II, LLC, each d/b/a Suddenlink Communications, and Altice USA (collectively referenced as "Suddenlink", "Optimum", or "Defendants"), on information and belief:

1.      On February 9, 2022, the Public Service Commission of West Virginia (the "Commission") found that Suddenlink "failed to provide safe, adequate and reliable service to its West Virginia subscribers by, *inter alia,* intentionally reducing its maintenance work and maintenance budget, reducing full-time employees, changing its methods of communicating with its subscribers and ignoring the thousands of customer complaints that resulted."  This finding followed numerous complaints concerning Defendants' wholly inadequate service that has severely damaged the ability of West Virginians to engage in commercial competition, obtain

information, communicate, and enjoy entertainment in a digital age.  Meanwhile, citizens of similarly situated cities in similarly situated states enjoy service superior to that provided by Defendants.  As a result, Defendants' failures significantly impede the quality of life of West Virginians.  The impact of those failures was significantly magnified when many West Virginians were required to engage in remote learning or work using Defendants' inadequate services.

2.     Suddenlink's adhesion contract seeks to impose arbitration as to some claims, but allows this Court to determine others, requiring Plaintiff to file in multiple forums.  Further, Plaintiff desires to compel Defendants to improve their services.  Suddenlink's adhesion contract, however, deprives the arbitrator of any such power: "neither You nor Suddenlink may seek, nor may the arbitrator award, non-individualized relief that would affect other account holders."

3.     Because as a practical matter any improvement in Defendants' services to Plaintiff would necessarily benefit other Suddenlink customers, the filing of this Action is necessary to provide Plaintiff complete relief against Defendants.

4.     The Suddenlink adhesion contract states "**BY ENTERING INTO THIS AGREEMENT, YOU AND OPTIMUM EACH WAIVE … THE RIGHT TO PARTICIPATE IN A CLASS, REPRESENTATIVE, OR PRIVATE ATTORNEY GENERAL ACTION.**" (allcaps and bold in original).  It also says: "**Any and all disputes arising between You and** Optimum, or Your or its respective predecessors in interest, successors, assigns, and past, present, and future parents, subsidiaries, affiliates, officers, directors, employees, and agents, shall be resolved by binding arbitration on an individual basis in accordance with this arbitration provision." (bold in original).

5.     Despite these provisions, and during the time Defendants were in settlement negotiations with Roxy Gooch, Richard Chaty, Benjamin Meadows (who this Court previously

found were not compelled to arbitrate) and Plaintiff Edens, Suddenlink entered into a class action settlement in New Jersey state court and sent out notice of that settlement to numerous West Virginians who were represented by counsel, including Ms. Gooch.

6.     Thus, Suddenlink seeks to *deny* Roxy Gooch and Plaintiff Edens the right to sue in court, while simultaneously seeking to *require* Roxy Gooch and Plaintiff Edens to be part of a class action in New Jersey state court.

7.     Despite extending the Class to Arkansas customers,[1] Defendants in at least five instances are under Court Order – for which they successfully advocated – to arbitrate all claims under Arkansas law.[2]

## I.     PARTIES

8.     Plaintiff Cheri Michelle Edens is an individual domiciled in St. Albans, Kanawha County, West Virginia.  Plaintiff has been a customer of Suddenlink since April 2020.

9.     Defendant Cebridge Acquisition, LLC is a Delaware corporation with its principal place of business in Long Island City, New York.

10.     Defendant Cequel III Communications I, LLC is a Delaware corporation with its principal place of business in St. Louis, Missouri.

11.     Defendant Cequel III Communications II, LLC is a Delaware corporation with its principal place of business in St. Louis, Missouri.

---

[1] Settlement Agreement p. 5 (citing the Arkansas Deceptive Trade Practices Act, Ark. Code §§ 4-88-101 et seq.); p. 7 (Defining Class as "All persons in the United States …").

[2] *Altice USA, Inc. v. Johnson*, 2023 Ark. App. 120, 17, 661 S.W.3d 707, 720 (2023), *reh'g denied* (Apr. 12, 2023); *Altice USA, Inc. v. Runyan*, 2023 Ark. App. 124, 13, 662 S.W.3d 247, 254 (2023), *reh'g denied* (Apr. 12, 2023); *Altice USA, Inc. v. Campbell*, 2023 Ark. App. 123, 13, 661 S.W.3d 720, 729 (2023), *reh'g denied* (Apr. 12, 2023); *Altice USA, Inc. v. Francis*, 2023 Ark. App. 117, 11 (2023), *reh'g denied* (Apr. 12, 2023); *Altice USA, Inc. v. Peterson*, 2023 Ark. App. 116, 10, 661 S.W.3d 699, 706 (2023), *reh'g denied* (Apr. 12, 2023) (all finding "circuit court erred when it denied Suddenlink's motion to compel arbitration").

12.     Defendant Altice USA is a Delaware corporation with its principal place of business in Long Island City, New York.

## II.     JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.

14.     Suddenlink's adhesion contract provides that: "All issues are for the arbitrator to decide, except that issues relating to arbitrability, the scope or enforceability of this arbitration provision, or the interpretation of its prohibitions of class, representative, and private attorney general proceedings and non-individualized relief shall be for a court of competent jurisdiction to decide." Suddenlink Agreement 24(d).

15.     Venue in this Court is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district, where Plaintiff received services from Suddenlink.  Suddenlink is a service provider and can be found in this judicial district, where it provides cable television service, which it refers to as "Video Service"; high speed data service, which it refers to as "High Speed Internet Service"; voice service, which it refers to as "Phone Service"; and other related services.

## III.     BACKGROUND

### A.     The Commission Order Regarding Video Service.

16.     "The purpose of the Public Service Commission is to ensure fair and prompt regulation of public utilities; to provide for adequate, economical and reliable utility services throughout the state; and to appraise and balance the interests of current and future utility service

customers with the general interest of the state's economy and the interests of the utilities." http://www.psc.state.wv.us/missionstatement.htm.[3]

17.     The Commission found in its February 9, 2022 Commission Order (the "Order") that: "In 2015, Altice N.V. (dba Altice USA, hereinafter, Altice) acquired the facilities and customers of Cebridge Telecom WV, LLC, which gave it control of Cequel Corporation, and others, all of which were doing business as Suddenlink Communications in the State of West Virginia. Case No. 15-0878-T-PC (Altice Acquisition Case) (Commission Orders dated July 21, 2015 and August 20, 2015). Altice continues to provide cable television service in this State as Suddenlink, offering service to more than 300,000 households and small businesses over a hybrid fiber optic- coaxial network with more than 8,500 plant miles and eight headends across West Virginia." Order at 3.

18.     According to the Order, Altice painted a "rosy picture" concerning "its qualifications, capabilities and intentions with respect to its West Virginia operations. … Altice touted itself as: '[A] leading provider of communications services (cable television, high- speed broadband Internet and fixed-line telephony) in Western Europe, Israel, the French Overseas Territories and other regions.'" *Id.* at 26.

19.     Altice further told the Commission that:

---

[3] According to West Virginia Code § 24-1-1 (a): "It is the purpose and policy of the Legislature in enacting this chapter to confer upon the Public Service Commission of this state the authority and duty to enforce and regulate the practices, services and rates of public utilities in order to:  (1) Ensure fair and prompt regulation of public utilities in the interest of the using and consuming public;  (2) Provide the availability of adequate, economical and reliable utility services throughout the state;  (3) Encourage the well-planned development of utility resources in a manner consistent with state needs and in ways consistent with the productive use of the state's energy resources, such as coal;  (4) Ensure that rates and charges for utility services are just, reasonable, applied without unjust discrimination or preference, applied in a manner consistent with the purposes and policies set forth in article two-a of this chapter and based primarily on the costs of providing these services".

Altice's operational expertise, scale and resources, will enable Cequel [Suddenlink] to accelerate network investment while maintaining a superior level of reliability and customer support.

Altice already has considerable experience as an owner of existing video, telephony, and broadband service providers that will enable it to contribute global strategic insights to Cequel's [Suddenlink's] current and future operations.

Altice has a demonstrated history of investing in existing video, telephony and broadband service providers and making strategic investments that enhance their value proposition for consumers. In some cases this has manifested itself through investments in network infrastructure, which has resulted in higher broadband speeds for subscribers. In other cases, this has manifested itself through accelerations in existing planned network investment and deployment, bringing improved services to market faster. And in still other cases, it has resulted in the expansion of service offerings, thereby expanding consumer choices and enhancing competition.

*Id.*

20.     The Order states that Altice voluntarily described itself as follows:

Altice has taken steps to migrate legacy information technology systems to newer platforms, resulting in operational efficiencies and overall improvements to the customer experience. In other cases, Altice has enhanced the customer experience by focusing on the deployment of improved set-top boxes that can enable consumers to navigate its panoply of service offerings with greater speed and efficiency. Altice and its operating affiliates also have taken steps in the past to simplify and improve their product offerings so that consumers have a clearer understanding of what they are purchasing and the differences in price points for 9 various service options.

*Id.* at 26-27.

21.     Although not noted in the Order, a May 20, 2015 Suddenlink press release announcing the acquisition noted: "Suddenlink represents an excellent fit for the Altice Group and will benefit from the operational expertise, scale and investment support that are at the core of the Altice business model." https://altice.net/sites/default/files/pdf/689389.pdf.

22.     Prior to the Altice acquisition of Suddenlink, Suddenlink had "a well invested, leading broadband network across its footprint, … [and] a strong operational and financial growth

track record. Suddenlink's focus on service, innovation and investments provide a strong basis for extending its market leadership and growth momentum." *Id.*

23.     Despite what it told the Commission, Altice had a different story for the stock market.  Analysts at ING wrote in a research note that Altice was aiming for $215 million in cost savings per year at Suddenlink, while Reuters stated that "Altice is expected to apply its usual formula at Suddenlink, namely aggressive cost cuts and attention to profit instead of volume of customers."

24.     By 2017, Altice USA CEO Dexter Goei was bragging that Suddenlink had taken out at least half of the targeted costs, with more cuts to come.  "We're turning the screws a little more," Goei said, despite the facts that the low hanging cost cutting fruit had been picked and further reductions would severely impair service.   At the same time, Goei crowed that Suddenlink's 47.3% profit margins were the highest in the U.S. cable industry.

25.     The shift to aggressive cost cuts and attention to profit from "Suddenlink's focus on service, innovation and investments" had significant consequences for West Virginians: "Since … Altice took over operations in West Virginia, the Commission received as of August 26, 2021, in excess of 2,764 customer complaints regarding Suddenlink's service, with approximately 1,900 of those complaints being received since 2019."  Order at 3.

26.     The Commission initiated Case No. 21-0515-CTV-SC-GI "because of the volume of customer Complaints and the Commission was not pleased with Suddenlink's initial response to this very serious matter. The Commission opened a show cause proceeding as to why Suddenlink should not be required to take specific remedial steps and why the Commission should not impose penalties as authorized by state law." *Id.*

27.     After hearing the evidence, including Suddenlink's response and testimony, the

Commission made the following findings of fact:

1. In West Virginia, Suddenlink has a potential customer base of more than 300,000 households and small businesses. It provides service over a hybrid fiber optic-coaxial network with more than 8,500 plant miles and eight headends across the State. Suddenlink Letter at 4 (June 7, 2021).

2. Suddenlink has 133,794 actual subscribers of cable television service in West Virginia. Suddenlink's Cable Television Annual Reports as of June 3, 2020 (Cable Television Form 7, Schedule C).

3. The Commission received in excess of 2,764 customer complaints regarding Suddenlink's service, as of August 26, 2021, with approximately 1,900 of those complaints being received since 2019. Staff Ex. 6; Suddenlink Letter at 2 (June 7, 2021).

4. Suddenlink did not report to the Commission cable service outages that last over twenty-four hours. Tr. II at 46-47; 124-125.

5. Suddenlink customers cannot request a credit for a qualifying outage when they call to report the outage. A customer has to call a second time, after the outage, to request a credit. Tr. II at 106-107, 124-125, 211; Staff Ex. 6.

6. When calling to report a service issue, Suddenlink customers oftentimes have to wait days or weeks for a service technician. Tr. II at 32; Staff Ex. 6; Customer Complaints and Comments, generally.

7. Suddenlink lacked an effective escalation policy; therefore, customers were unable to speak to a supervisor upon request. Customers were not provided a callback as promised. Tr. I at 221-222; Tr. TI at 127-128; Staff Ex. 7; Customer Complaints and Comments, generally.

8. Suddenlink has implemented a new Supervisor Escalation Process and it agreed to provide Staff with monthly data regarding the process. Tr. I at 256; 245-248.

9. Customers have experienced long wait times and no call back when making calls to Suddenlink. Tr. I at 267.

10. Suddenlink does not provide Basic Tier 1 cable service in the area of Sissonville, West Virginia. Tr. II at 49; Co. Ex. 3.

11. Suddenlink did not post customer payments timely, which resulted in customers' service being terminated and/or incurring late fees. Tr. II at 131-132.

12. Suddenlink charged excessive late fees in West Virginia during the year 2020. Tr. II at 97; Staff Ex. 5.

13. Suddenlink currently operates in 31 West Virginia counties and has 115 service areas, yet it only operates seven business centers in the State. Tr. 11 at 133-134; Staff Ex. 7.

14. Suddenlink significantly decreased the amount of its outside plant maintenance in year 2018, and continued to decrease its maintenance and expenditures until year 2021. Commission Post-Hearing Requested Exhibits 1A and 1B (Confidential); Tr. I at 28; Tr. at 186-187; Tr. I at 338.

15. During the term of Altice's Technical Service division's operation, it stopped doing plant maintenance entirely. Tr. I at 338.

16. There is a correlation between the decrease in amounts spent on outside plant maintenance and the increase in customer complaints for the years 2018-2020. Staff Ex. 6.

17. Suddenlink does not do vegetation management unless it is working on a cable line where vegetation is an issue. It relies on the electric companies to maintain the vegetation along the lines. Tr. I at 143.

18. The Commission received complaints and customers provided comments regarding inconsistent billing, oftentimes involving increases for no known reason. Customer Complaints and Comments, generally.

19. Suddenlink is in the process of combining all of its surcharges with its base fees for service. Tr. I at 302-303.

20. Suddenlink has improperly accounted for and remitted E-911 fees in certain West Virginia counties. Tr. II at 106; Staff Ex. 6. See also Wayne County Commission v. Cebridae Telecom WV, LLC dba Suddenlink Communications, Case No. 20-0752-T-C (Recommended Decision dated June 23, 2021, final July 13, 2021).

21. Suddenlink had 28 expired franchise agreements and four that were to expire by the end of 2021. Staff Ex. 5.

22. Suddenlink has not been using the Commission's Form No. 2 for its franchise agreements or an agreement that contains all the standards set forth in the Cable Rules. Tr. 11at 94.

23. Suddenlink does not always file a formal application (Form No. 1) for a franchise agreement renewal, and does not pay the $250 fee, when the time period reaches the 120-day period before expiration, but continues with an informal process. Tr. II at 57-59.

24. Suddenlink provides in-house training for its employee technicians, but only requires contractors to complete virtual training for general cable television knowledge. In addition to virtual training, Suddenlink also uses a "train the trainer"

method for Suddenlink specific items, which involves Suddenlink training one person within a contractor's organization and that person training other individual technicians in the contractor's organization. Tr. II at 109-110; Staff Ex. 6.

25. Suddenlink's contractors were not properly registered and licensed to do business in West Virginia. Tr. II at 108.

26. Suddenlink has metrics that use key performance indicators (KPIs) to measure its employees' and contractors' performance. The KPIs include showing up for service calls on time, whether jobs are completed on the first visit correctly without a second visit. KPIs also measure customer feedback about Suddenlink's technician's performance. Tr. I at 33-35.

27. Suddenlink directly monitors its employees' performance and performs random quality checks, whereas contractor organizations are responsible for monitoring their individual contractors' performance. Tr. II at 108; Staff Ex. 6.

28. In West Virginia Suddenlink employs 43 field technicians and 32 outside plant construction technicians, for a total of 75, and it has 83 contractors to perform installations. Tr. II at 120; Staff Ex. 6.

29. Suddenlink has 33 full-time employees and two contractors in its Beckley office. In Charleston, the largest city in the State, it has one full-time employee for outside plant and the rest are contractors, for a total technician count of 26. The Company does not have any full-time employees or contractors based in the Elkins office. Tr. at 53-60; City's Cross Ex. 2.

30. Suddenlink has no employee field technicians in its Buckhannon, Charleston, Point Pleasant and Wayne service areas, and only employs one outside plant technician in Charleston, Point Pleasant and Wayne. Staff Ex. 6.

31. In 2017, after Altice acquired Suddenlink, it closed its only West Virginia call center and also closed a dispatch training center that was located in West Virginia and began routing its customer calls to call centers located outside of the United States. Staff Ex. 6.

32. In 2019, Suddenlink answered only 36 percent of calls in the United States; five percent in 2020; and routed only two percent of calls to representatives in the United States in 2021. The call centers are located in Egypt, Jamaica, Dominican Republic, South Africa and Columbia. Id.; Staff Ex. 9.

33. As the number of customer calls handled internationally increased, so did the number of customer complaints, many of which involved: Long wait times to speak to a representative; appointments for service technicians not being made promptly, but being scheduled days and weeks out; an inability to escalate calls to supervisors; and customers that were unable to effectively communicate with the call center representatives. Tr. at 105; Staff Ex. 6.

34. Suddenlink complaints increased in 2017 to 193 (an increase from 118 in 2016), and continued to increase in subsequent years as follows: 316 in 2018; 585 in 2019; an astounding 1005 in 2020; and a count of 665 through August 26, 2021.  Staff Ex. 6.

35. Suddenlink has a call center located in Texas, which prioritizes business customers and rarely handles non-business customer calls. Tr. I at 249; 306-308.

36. Suddenlink intends to open another call center in the United States. Tr. I at 218-220; 306.

37. Once Altice took over operations, it intentionally reduced its maintenance work and maintenance budget, reduced staff, changed its methods of communication with subscribers and ignored the thousands of resulting customer complaints. Staff Ex. 9; Transcript, generally; Case file, generally.

38. Since the date Altice consummated its purchase of Suddenlink on December 21, 2015, it has violated the West Virginia Act on a daily basis by, *inter alia,* failing to provide safe, adequate and reliable service to its subscribers. Id.

28.     The Commission also made Conclusions of Law, including:

1. W. Va. Code § 24D-1-1 *et seq*., the Act, imposes legal requirements on providers of cable television service.

2. Suddenlink does not employ enough full-time outside plant personnel or enough full-time service technicians, thereby violating W. Va. Code § 24D-1-14(a), by failing to maintain its facilities in a condition that provides safe, adequate and reliable service to its West Virginia subscribers. Tr. II at 109; Tr. I at 330-331.

3. Since Altice took over, Suddenlink cable television service has not been safe, adequate or reliable as required by W. Va. Code § 24D-1-14(a); Tr. I at 159-163.

**B.   The Order's Findings Apply to High Speed Internet and Phone Service.**

29.     The Commission's findings of fact concerning Suddenlink's provision of cable services apply equally to Suddenlink's provision of High Speed Internet Service and Phone Service.

30.     Suddenlink utilizes the same infrastructure and processes to provide all of its services, including Video Service, High Speed Internet Service, and Phone Service.  Therefore, the problems the Commission identified as plaguing Suddenlink's provision of Video Service also plague Suddenlink's provision of High Speed Internet Service and Phone Service.

31.     Suddenlink's "High Speed Internet Service" is deceptively named, as it is not "High Speed" and, is also not a "Service", to the extent "Service" is defined as "an act of helpful activity". Dictionary.com (definition 1 of "service" as a noun).  Suddenlink's "Phone Service" suffers from the same defect.

32.     Plaintiff's household has repeatedly tested the speed of Suddenlink's "High Speed Internet Service" using independent testing sites and the Suddenlink-recommended speedtest.net, which defaults to a Suddenlink server when doing the test.  This produces results showing substantially faster speeds.  Based on these tests, Suddenlink's testing produces a deceptive and inaccurate result.

33.     The American Customer Satisfaction Index Telecommunications Study (the "ACSI Study") published on June 8, 2021, "is based on interviews with 37,907 customers, chosen at random and contacted via email between April 1, 2020, and March 29, 2021. Customers are asked to evaluate their recent experiences with the largest companies in terms of market share, plus an aggregate category consisting of 'all other'—and thus smaller—companies in those industries." According to the ACSI Study, Suddenlink ranked last in customer satisfaction for subscription television service, internet service providers, and landline phone service.  Suddenlink's last place subscription television service customer satisfaction score did not change from the ACSI Study published June 9, 2020, while Suddenlink's 2021 customer satisfaction score decreased 4% for internet and 5% for landline phone from 2020.

34.     The 2021 ASCI Study did not comment on Suddenlink's performance, but the 2020 ASCI Study contained the following comments:

a.      Subscription television service: "Despite a small uptick to 56, Suddenlink (Altice USA) remains in last place and customers find its bills harder to understand than any other pay TV provider."

b.      Internet: "According to ACSI data, Suddenlink's ability to keep outages to a minimum has eroded significantly."

c.      Phone: "Across all providers, Suddenlink rates worst in class for staff courtesy and helpfulness."

**C.   Defendants' Unconscionable Adhesion Contract.**

35.     Defendants claim all customers are bound by an unsigned, internet-posted, take-it-or-leave-it "agreement".

36.     Customers have no bargaining power respecting the terms of the agreement.

37.     The Suddenlink adhesion contract effectively imposes no obligations on Suddenlink, but numerous obligations on the customer.

38.     The Suddenlink adhesion contract exposes the customer to unlimited liability while severely restricting Suddenlink's liability.

39.     Juxtaposing a sample of contract terms starkly demonstrates the Suddenlink adhesion contract's unconscionability (emphasis added in italics):

a.      This Agreement and the Services and/or Equipment supplied by Suddenlink *are not assignable* or otherwise transferable *by Customer*, without specific written authorization from Suddenlink. *In Suddenlink's discretion, Suddenlink may assign*, in whole or in part, this Agreement, and Services may be provided by one or more legally authorized Suddenlink affiliates.  Suddenlink Agreement ("SA") 21.

- 13 -

b.      Whether the cable modem is owned by Customer or Suddenlink, *Suddenlink shall have the unrestricted right, but not the obligation, to upgrade the firmware* in the cable modem at *any time that Suddenlink, in its sole discretion, determines* it is necessary or desirable. *Customer assumes all responsibility for any* degradation in or problems from the *failure to upgrade*.  Additional Terms of Service for High Speed Internet Services ("AT") 3.

c.      *Suddenlink may terminate* this Agreement, disconnect any or all Services, and remove Equipment at any time, without prior notice, *for any reason whatsoever or for no reason*… SA 15.  *If any material change negatively affects your High Speed Internet Service, you have the right to cancel* your High Speed Internet Service. Your continued receipt of the High Speed Internet Service for more than thirty (30) days after the change, however, will constitute your acceptance of the change.  AT 13.

40.    The Suddenlink adhesion contract imposes numerous unreasonable and unconscionable terms on customers, including, but not limited to (emphasis added in italics):

a.      The Services provided under this Agreement are solely for Customer's personal, residential use and *Customer shall not use Services for any commercial purpose. Suddenlink shall have the right to determine, in its sole discretion, what constitutes a "commercial" purpose*.  SA 11(a).  Customer may not use the High Speed Internet Service for commercial or business purposes.  AT 10.

b.      *Customer is responsible* for ensuring that all persons who use Customer's Services (each, a "User") understand and comply with all terms and conditions applicable to the Services.  SA 12.

- 14 -

c.      It shall be a violation of this Agreement for Customer or any User: (1) to engage in any conduct prohibited by this Agreement (or by any terms and conditions incorporated herein by reference); or (2) not to engage in conduct required by this Agreement, *each case determined in Suddenlink's sole good faith discretion*. *Id.* 14.

d.      *If Suddenlink terminates Service* due to a violation of this Agreement or Suddenlink's policies, *Customer may be subject to additional fees and charges*, including disconnect and termination fees and Suddenlink may also exercise other rights and remedies available under law. *Id.* 15.

e.      In addition, whether or not the conduct set forth below is elsewhere prohibited by this Agreement, it shall be a violation of this Agreement if: … f. The amount of customer and/or technical support required to be provided to Customer or any User *is excessive in the sole good faith discretion of Suddenlink*. *Id.* 14(f).

f.      *Customer shall pay* reasonable collection and/or attorney's fees to Suddenlink in the event that *Customer shall find it necessary to enforce* collection or to preserve and protect its rights under this Agreement. *Id.* 16.

g.      *Customer agrees to defend, indemnify and hold harmless the Suddenlink Parties* from and against any and all claims and expenses, including reasonable attorneys' fees, arising out of or related in any way to the use of the Service and Equipment by Customer or otherwise arising out of the use of Customer's account or any equipment or facilities in connection therewith, or the use of any other products or services provided by Suddenlink to Customer. *Id.* 23.

h.      **YOU AGREE TO ARBITRATE YOUR DISPUTE AND TO DO SO ON AN INDIVIDUAL BASIS; CLASS, REPRESENTATIVE, AND PRIVATE**

**ATTORNEY GENERAL ARBITRATIONS AND ACTIONS ARE NOT PERMITTED.** *Id.* 24(g).

41.     The Suddenlink adhesion contract effectively negates any Suddenlink obligations by imposing numerous unreasonable and unconscionable limitations on Suddenlink's obligations, including, but not limited to (emphasis added in italics):

a.      **Customer expressly agrees that: (a) the Services provided are best efforts services and the Services, Software and Equipment are provided by Suddenlink on an "AS IS" and "AS AVAILABLE" basis *without warranties of any kind*, either express or implied; (b) the Suddenlink Parties are not responsible or liable for any loss or impairment of service due in whole or in part to Customer owned- or provided-Equipment; and (c) all use of the Services, Software and Equipment, including that provided by Third Party Providers, as well as the purchase, download or use of any third party service, product, or application provided by or accessed through the Services or Equipment, are provided at Customer's sole risk and Customer assumes total responsibility for Customer's or any User's use of the Services. Without limiting the generality of the foregoing, *the Suddenlink Parties make no warranty*: (i) that the Services will be uninterrupted or error free or that the Equipment will work as intended; (ii) as to transmission or upstream or downstream speeds of the network; (iii) that the Services, Equipment or Software are compatible with any Customer owned- or provided-Equipment; or (iv) as to the security of Customer's communications via Suddenlink's facilities or Services, or that third parties will not gain unauthorized access to or monitor Customer's communications.** *Id.* 22.

b. Any adjustment or refund, *given in each case in Suddenlink's sole discretion*, will be accomplished by a credit on a subsequent bill for Service, unless otherwise required by applicable law. *Id.* 9.

c. No undertaking, representation or warranty made by an agent or representative of Suddenlink in connection with the sale, installation, maintenance or removal of Suddenlink's Services or Equipment shall be binding on Suddenlink except as expressly included herein. *Id.* 30.

d. Suddenlink may also, at any time and *in its sole discretion, without notice*, change, add to or remove portions of the High Speed Internet Service (including, without limitation, content, functionality, hours of availability, Equipment requirements, speed, upstream and downstream limitations, Service features, storage capacity, and protocol filtering) and/or institute or *otherwise change rates, fees and charges* for the High Speed Internet Service. AT 13.

e. Use of the High Speed Internet Services provided by Suddenlink, in addition to third-party products or services provided by or accessed through the High Speed Internet Service or the Internet is *at Customer's sole risk* and Customer acknowledges that the High Speed Internet Services are provided "**AS IS.**" Accordingly, any information sent through or over the network is sent at Customer's sole risk. AT 18.

42. The Suddenlink adhesion contract imposes numerous unreasonable and unconscionable terms on Suddenlink's liability, including, but not limited to (emphasis added in italics):

a. … the liability of Suddenlink, its officers, shareholders, directors, employees, affiliates, vendors, carrier partners, content providers and other persons or

entities involved in providing the Services or Equipment (collectively, the "Suddenlink Parties") for damages *shall in no event*, by reason of any delays, interruptions, omissions, errors, failures or defects in installation or service, *exceed an amount equal to the Customer's Service charges and associated Equipment fees* for a regular billing period ("Maximum Credit").  SA 9.

   b.     No credit allowance will be made for interruptions of Service that are: ... e. during a period in which Customer continues to use the Service on an impaired basis; … *Id.* 9

   c.     Customer agrees that in the event of termination by Suddenlink: (i) Suddenlink and any Third Party Providers of co-branded services offered as part of or through the high speed internet service *shall have no liability to Customer* or any User; and (ii) unless expressly prohibited by law, Suddenlink, *in its sole good faith discretion*, may decline or reject a new application for service or block access to or use of any component of the Services by Customer or any former User. *Id.* 16.

   d.     Suddenlink *assumes no liability* for any program, services, content or information distributed on or through the Services, Equipment or the cable system, unless locally provided by Suddenlink, and *Suddenlink expressly disclaims any responsibility* or liability for your use thereof.  *Id.* 18.

   e.     **Except for a refund or credit as expressly provided in this Agreement, *in no event (including negligence) will the Suddenlink Parties be held responsible or liable* for any loss, damage, cost or expense including direct, indirect, incidental, special, treble, punitive, exemplary or consequential losses or damages including, but not limited to, loss of profits, earnings, business opportunities, loss of data, personal**

**injury (including death), property damage or legal fees and expenses, sought by Customer or anyone else using Customer's Service account: (x) resulting directly or indirectly out of the use or inability to use the Services (including the inability to access emergency 911 or e911 services) and/or use of the Software, Equipment or provided third party services or otherwise arising in connection with the installation, maintenance, failure, removal or use of Services, Software and/or Equipment or Customer's reliance on the Services, Software and/or Equipment, including without limitation any mistakes, omissions, interruptions, failure or malfunction, deletion or corruption of files, work stoppage, errors, defects, delays in operation, delays in installation, failure to maintain proper standards or operation, failure to exercise reasonable supervision, delays in transmission, breach of warranty or failure of performance of the Services, Software and/or Equipment; or (y) resulting directly or indirectly out of, or otherwise arising in connection with, any allegation, claim, suit or other proceeding relating to Services, Software and/or Equipment, or the infringement of the copyright, patent, trademark, trade secret, confidentiality, privacy, or other intellectual property or contractual rights of any third party.** *Id.* 22.

f. **If Customer resides in a state which laws prevent Customer from taking full responsibility and risk for Customer's use of the Services and/or Equipment,** *Suddenlink's liability is limited to the greatest extent allowed by law.* *Id.*

g. In all events, Suddenlink *shall have no liability whatsoever* for any damage or loss or destruction of any of Customer's software, files, data or peripherals. AT 4.

43. To prevent a class action, Defendants engaged in a cynical ploy, allowing a customer to avoid the arbitration clause: **"IF YOU BECAME A CUSTOMER ON OR WITHIN**

- 19 -

**30 DAYS OF THE EFFECTIVE DATE OF THIS AGREEMENT, AND DO NOT WISH TO BE BOUND BY THIS ARBITRATION PROVISION, YOU MUST NOTIFY SUDDENLINK IN WRITING WITHIN 30 DAYS OF THE EFFECTIVE DATE OF THIS AGREEMENT BY EMAILING US AT NOARBITRATION@ALTICEUSA.COM OR BY MAIL TO ALTICE SHARED SERVICES, 200 JERICHO QUADRANGLE, JERICHO, NY 11753 ATTN. ARBITRATION. YOUR WRITTEN NOTIFICATION TO SUDDENLINK MUST INCLUDE YOUR NAME, ADDRESS, AND SUDDENLINK ACCOUNT NUMBER AS WELL AS A CLEAR STATEMENT THAT YOU DO NOT WISH TO RESOLVE DISPUTES WITH SUDDENLINK THROUGH ARBITRATION.**" SA 24(a).

44.     Suddenlink knows that so few customers avail themselves of this option that, if enforced, the likelihood of a class meeting Fed. R. Civ. P. 23(a)(1) is substantially diminished, and that any relief provided such a small class would be *de minimis*.

45.     Despite the fact that service takes place in West Virginia, the Suddenlink adhesion contract negates West Virginia state law and imposes federal and New York law:  "Because the Service(s) provided to You involves interstate commerce, *the Federal Arbitration Act ("FAA"), not state arbitration law*, shall govern the arbitrability of all disputes under this arbitration provision. *Any state statutes pertaining to arbitration shall not be applicable*." *Id.* 24(f). "Subject to Section 24.f above, *this Agreement shall be governed by* the laws of the state of *New York*." *Id.* 25.

46.     Not content to bind the customer solely to the adhesion contract, Suddenlink seeks to bind customers to even more requirements, including new terms at the time of installation: "This Agreement, including the applicable Additional Terms of Service, Privacy Policy and Acceptable Use Policy ("AUP"), the work/service order *presented to You at time of installation* ("Service

Order") and the Schedule of Fees constitute the entire agreement between Suddenlink and Customer with respect to the Services." *Id*. 30.  Suddenlink's use of the phrase "presented to you" rather than "offered to you" demonstrates the disparity of bargaining power between the parties to the Suddenlink adhesion contract.

47.     Suddenlink can change the Suddenlink adhesion contract at any time and without warning by merely updating the Suddenlink Acceptable Use Policy ("AUP"):  "The AUP will be updated from time to time and the latest version will supersede all prior versions."  AT 5.

48.     The Suddenlink adhesion contract is not understandable to even the most sophisticated readers, as demonstrated by the following statement from February 2022:

> My name is Leena Mehedale, and I am currently a first-year student at the Massachusetts Institute of Technology in Cambridge, MA. Prior to attending MIT, I graduated from the prestigious Hockaday School in Dallas, TX, where I had studied since age four. It is my belief that, after attending such an institution for fourteen years, I have amassed many skills in reading as well as reading comprehension and analysis. In the year 2020, I received a 1530 on the SAT exam, which includes a 730 out of 800 on the "Evidence-Based Reading and Writing" portion of the examination. This score therefore places me in the 99th percentile among all students across the nation. Based on these performances, I believe myself to have great reading comprehension skills, which is why I was shocked to have such difficulty reading and understanding the terms and conditions of Optimum's services.

> Upon spending over forty-five minutes reading through the terms and services under the assumption that I was purchasing Optimum's services and were inclined to read this, I found the agreement to be incredibly difficult to understand. Not only did I not understand many of the words found in the terms and conditions, but I was unable to comprehend what the terms themselves were trying to convey. Furthermore, upon being prompted with simple comprehension questions after the reading, I was unable to answer a single question with any certainty at all. It is my belief that, if I have been raised with a strong education in terms of reading comprehension and still have great difficulty processing this agreement, these terms and conditions would be simply incomprehensible for any customer of the average population. Furthermore, while I stumbled through these terms and conditions reading them alone and on my own accord, I find that this task would be outright impossible with a technician standing over the customer while they attempt to read this agreement.

Therefore, as a person of good educational standing and a strong background in reading comprehension, I don't believe that these terms and conditions are in any way comprehensible to the average customer.

49.     According to the Tri-State Literacy Counsel, most West Virginians do not have reading skills anywhere near those possessed by Ms. Mehendale: "21% of West Virginians 16-74 are at or below a Level 1. Adults at this level are at risk for difficulties using and understanding print material. Adults at the upper end may be able to fill out short forms, and adults at the lower end are considered functionally illiterate.   42% of West Virginians 16-74 are at Level 2.  Adults at this level are considered nearing proficiency. Complex inference and evaluation will be too difficult.  37% of West Virginians 16-74 are at or above Level 3. Adults at this level are considered proficient at working with print material. This is statistically lower than the national average."

**D.  Plaintiff's Suddenlink Experience.**

50.     Plaintiff has experienced Suddenlink's constant service interruptions, frustrating customer telephone service calls, contradictory or illogical explanations, and ineffective in-person service calls (for which she is charged additional fees) throughout her Suddenlink service. Plaintiff's Suddenlink experience is consistent with the Order's findings of fact.

51.     On September 24, 2021, Plaintiff delivered to Suddenlink a notice concerning her problems with Suddenlink's services.

52.     According to the Suddenlink adhesion contract, the notice's purpose was to allow Suddenlink "an opportunity to resolve it without the need for arbitration".

53.     Suddenlink ignored Plaintiff's notice.

54.     On December 31, 2021, Plaintiff filed an arbitration with the American Arbitration Association for $10,000 or less.

55.     Only after Plaintiff filed the arbitration did Suddenlink make any effort to contact Plaintiff to resolve the service issues.

56.     Pursuant to the Suddenlink adhesion contract: "Except as otherwise provided in this arbitration provision, Suddenlink will pay all arbitration filing, administrative, and arbitrator fees for any arbitration that Suddenlink commences or that You commence seeking damages of $10,000 or less."  SA 24(e).

57.     Given the fact that Suddenlink ignored Plaintiff's notice, it would have been futile to request that Suddenlink pay Plaintiff's arbitration filing fee.  Therefore, Plaintiff paid the $200 arbitration filing fee.

58.      On February 16, 2022, The American Arbitration Association (AAA) sent notice that it "has not received an Answer from Respondent [Suddenlink] and the date set for filing of the Answer has now passed."

**E.  Suddenlink's Failed Infrastructure.**

59.     Suddenlink services are characterized by frequent unpredicted prolonged outages, sometimes at a single home in a neighborhood, sometimes throughout an entire neighborhood.

60.     Such outages are consistent with several types of failures.

61.     First, Suddenlink likely utilizes equipment that is past what manufacturers call "End of Life" ("EOL").  Once equipment passes EOL, it not only unpredictably ceases to operate, but it also is past the date its manufacturer provides software updates, sells spare parts, or is willing to provide service to repair malfunctions.  As a consequence, any equipment breakdown takes much longer to repair.

62.     Second, Suddenlink likely fails to maintain and upgrade its infrastructure and hardware.  In states with adequate high speed internet, phone, and video services, provider crews

are frequently seen proactively upgrading and maintaining equipment related to the delivery of those services.  Suddenlink personnel are rarely if ever seen performing proactive work to maintain and upgrade equipment.

63.     Third, Suddenlink fails to proactively manage vegetation along its lines.  In West Virginia, vegetation encroachment and hazardous trees are a major problem that ultimately result in damage to facilities and repeated service interruptions, especially in rural areas.  Suddenlink is aware of this, but simply relies on the electric companies to maintain the vegetation along its lines.

64.     Fourth, Suddenlink fails to hire experienced technicians or adequately train its employees.  As a result, equipment failures take longer to repair.  Further, inexperienced and inadequately trained technicians are prone to commit configuration and other errors leading to disruptions in service.

65.     Fifth, Suddenlink likely fails to utilize N+1 redundancy in either an "active / active" or "active / passive" configuration for mission critical equipment.  N+1 redundancy for active / active equipment means having one more piece of mission critical equipment than necessary active, so that if one piece of equipment fails, the remaining active systems can carry the load. N+1 redundancy for active / passive equipment means having one more piece of mission critical equipment than necessary on standby, so that if one piece of equipment fails, the failed equipment can be immediately replaced, minimizing any service disruptions.  Suddenlink's failure to utilize N+1 redundancy means that Suddenlink's system lacks resilience, and guarantees longer than necessary service interruptions when mission critical equipment fails.

66.     Karen Macon, Director of the Commission Utilities Division, detailed the decline of Suddenlink's performance in West Virginia since Altice took over operations. She believes the decline is attributable to Altice's decisions to hire the Altice Technical Service Division, move

technicians and fire qualified employees, inadequately train and monitor contractors, close its West Virginia call center and outsource its call centers internationally. Staff Ex. 9. She views Altice's decisions as focused more toward cost-cutting and without regard to customer service. Tr. II at 158. She believes that Suddenlink failed to provide safe, reliable and adequate service in the State of West Virginia. Order at 25.

67.     Suddenlink's lack of attention to facilities and customers' needs is recognized by its employees. Suddenlink's witness at the hearing that gave rise to the Order, Pragash Pillai, the Executive Vice-President of Operations for Altice USA, testified that since the Altice acquisition, Suddenlink has not been doing a good job. *Id.* (citing Tr. I at 159-163).

**F.     Suddenlink's Misrepresentations.**

68.     Suddenlink / Optimum makes multiple misrepresentations concerning its services.

69.     Example 1:




70.     Suddenlink has neither Speed nor Reliability.  Customers do not experience "fast, reliable connectivity", nor do customers "Get a fast and reliable connection".  Suddenlink does not have an "enhanced network".

71.     Suddenlink does not have a "100% fiber internet network".  In fact, on February 16, 2022, Altice CEO Dexter Goei said that:

> Lastly, I want to highlight that we announced today a new plan to bring 100 [Inaudible] fiber broadband, delivering multi-gig speeds to more than two-thirds of

our entire footprint over the next four years, reaching a total of 6.5 million FTTH passings by the end of 2025.  This will include about four million fiber passings at Optimum, covering all the areas where we overlap with FiOS and Frontier and 2.5 million fiber passings at Suddenlink. Fiber is the future, and given the progress we have made at Optimum with our fiber build, we're excited to build on that success and break ground later this year at Suddenlink to bring our state-of-the-art network to more customers and communities.

https://www.fool.com/earnings/call-transcripts/2022/02/16/altice-usa-inc-atus-q4-2021-earnings-call-transcri/.  From Goei's statement, it is evident that Altice had **plans to build** a fiber network at Suddenlink, but as of the date Suddenlink claimed to have a "100% fiber internet network", Suddenlink merely intended to "break ground later this year" on that fiber network.

72.     Example 2:

Is Suddenlink Internet cable or DSL?

Our internet service is brought into your household via a cable connection to our larger fiber optic network.

73.     Suddenlink does not connect any household to a "larger fiber optic network" because Suddenlink had yet to "break ground" in building the network at the time it published this misrepresentation.

74.     Example 3:



75.     A customer cannot "get help when you need it" from Suddenlink or even "get help". Suddenlink is not "committed to customer service."  Suddenlink has the worst customer service and experience in the industry.

76.     As the Commission Staff noted:

> Any company interested in providing quality customer service does not leave a customer waiting for an extended period of time to speak with a customer care representative. Yet, the Commission has received a number of complaints on this very issue. … That should be unacceptable to Suddenlink - yet it continues to happen day in and day out, simply because there are insufficient customer care representatives available on a daily basis to handle customer calls. There can be no other reason for such a delay in answering a customer's call.

Staff Br. at 28-29.

77.     Instead of waiting on the phone, a customer can opt to receive a callback at a later time. "But that callback function does not work. So the customer leaves a name and number and then is never called back. So when they finally realized they're not going to get a callback, they call back in and then they're put at the end of the line." *Id.* at 31.

78.     Further, if a customer does get the opportunity to speak with a Suddenlink representative, "the training provided the call center representatives is insufficient to allow them to address the myriad of complaints they receive from customers on a daily basis." *Id.* at 30.

79.     As a consequence, "the customer care representative will mark the ticket as resolved even though the customer was dissatisfied with the result." *Id.* at 33.

80.     "Oftentimes, customer service representatives refuse to record complaints of an outage or customers cannot reach a representative regarding an outage and are instead told by the interactive voice response (IVR) system that there is an outage in their area. This creates a problem for customers attempting to create a record, so that they can receive outage credit in the near future." *Id.* at 25-26.

81.     "Customers are also frustrated with Suddenlink's billing practices that have them paying a different amount each month for unknown reasons. Customer care representatives are unable to reassure customers that the bills they receive each month are accurate for the services being provided." *Id.* at 23.

82.     If a customer fails to resolve the issue with the Suddenlink representative, the customer may want to escalate to someone with more authority.  However, customers are "unable to speak with call center supervisors," and despite having a Company Customer Complaint Team, "only 0.78% of West Virginia complaints were escalated to the Company Customer Complaint Team."  *Id.* at 33.  "Coupled with the fact that call center representatives are given very limited authority to resolve issues, it makes sense that instead of escalation to the CCEC Review Team, complaints are being dismissed by the call center representatives."  *Id.*

83.     Suddenlink also "does not have an effective process for recording linking, and analyzing customer complaints.  … Obviously, Suddenlink does not understand what a complaint is … Because of this lack of understanding, Staff was unable to view the statutorily mandated complaint log because Suddenlink does not maintain such a log."  *Id.* at 31-32; *see also* Staff Rep. at 8 (Suddenlink was unable to produce such a log because it claimed it did not know what constituted a 'complaint'.").

84.     "Coupled with the predominately negative experience customers have with Suddenlink call centers, it is clear that resolving customer complaints is an area in which Suddenlink is sorely lacking."  Staff Br. at 34.

85.     Customers unable to obtain relief by phone may want to visit a Suddenlink business center where they can speak to a Suddenlink representative in person.

86.     West Virginia law "requires a business center to be located in or near a service area.  Suddenlink has 115 franchise agreements - each of which represent a service area. Yet it only has 7 business centers for the entire state of West Virginia."  *Id.* at 12.

87.     "[O]perating 7 business offices for 31 counties and 115 service areas is unreasonable and in violation of" West Virginia law.  *Id.* at 13.

88.     Suddenlink claimed it was planning on opening 3 new business centers, but refused to disclose the location, being unaware that Suddenlink "had to get prior approval of the location of a business center from a franchise authority or the Commission." *Id.*

89.     "[A]dding three additional business offices is far short of what is needed to provide adequate service to its West Virginia subscribers." *Id.*

90.     Assuming a customer can contact a representative, resolving the problem may require a visit from a Suddenlink technician.

91.     However, "Suddenlink does not have adequate staffing, especially in light of the number of comments and complaints that subscribers are waiting days and weeks to get an appointment for service." *Id.* at 43.

92.     Suddenlink technicians are also inadequately trained, suffer from low morale, lack motivation, and are disinterested in providing competent service.

93.     Suddenlink frequently charges customers $60 for a service visit, even though that visit failed to resolve the problem.

94.     Further, Suddenlink treats "substandard service such as pixilation, freezing, no sound, no picture, etc." "as a routine service call, scheduling a repair days or weeks after the initial call to the call center", even though that "should be addressed within 24 hours after the subscriber notifies Suddenlink of the issue" because "a subscriber is unable to watch cable television under those circumstances." Staff Rep. at 8-9.

95.     Example 4:

 

96.     Suddenlink does not offer Value or Transparency.  Suddenlink does not let anyone "Enjoy premium internet at great pricing".   Constant buffering and interruptions make it impossible to "Enjoy" Suddenlink's internet.  Suddenlink's internet is not "premium".  The pricing is not "great" or "low".  "Suddenlink is providing poor service quality to West Virginia subscribers and charging astronomical prices."  Staff Rep. at 1.

97.     The offers are not "transparent" and Suddenlink's bills are rife with "hidden fees" and inexplicable charges, and chalk full of "surprises".  Staff Br. at 24 ("Another concern is the mysterious fees and charges that appear on a customer's bill with no explanation. Suddenlink should provide explanations of each charge or fee on the customer bill in clear language so that customers will understand what the charges cover.  Staff recommends that Suddenlink adopt a clear billing practice that removes the element of surprise each month and so that customers understand the cost of each service being provided.").  Suddenlink's bills are harder to understand than those of any other provider.

98.     Customers "paid their bill on time but Suddenlink did not process the payment and instead assessed a late fee and terminated service."  *Id.* at 25.  Those are also "surprises."

99.     Example 5:



100.    Suddenlink sells customers levels of internet service (1 Gig, 500 Mbps, or 300 Mbps), but fails to deliver those levels.  In numerous Suddenlink service areas, the network is incapable of delivering the level of service sold.

101.    Example 6:



102.    Suddenlink does not provide "Blazing fast speeds" and, although Suddenlink "Offers up to 1 GB Internet", Suddenlink typically cannot deliver 1 GB Internet.

103.    Example 7:



104.    A customer cannot "Stay connected" on Suddenlink's network – that is one of the major problems with the service.

105.     Suddenlink's network is not "next generation" and Suddenlink has not "built a powerful network".  Suddenlink had yet to "break ground" on building the network at the time Suddenlink published this misrepresentation.  Suddenlink's existing network is dated and deteriorating.

106.     A customer cannot "connect faster than ever" because the network continues to deteriorate, making connections slower.

107.     1 Gig only is "available" in the sense that Suddenlink will sell that level of service but fail to deliver it.

108.     A customer cannot get "customer support".  A customer can call and listen to a frustrating and lengthy recording about rebooting the modem, then be transferred to an inadequately trained person in a foreign land who has not been given the resources or information needed to solve the customer's problem and would rather falsely claim the customer's problem is resolved than transfer that customer to someone with higher authority.

109.     Example 8: Suddenlink claims in a recent mailer to West Virginia customers that:

> **We heard you and we know it's time to reconnect.** Though keeping you connected to what you love has always been our number one goal, we understand that we haven't always gotten it right.

110.     It is untrue that "keeping you [customers] connected to what you love has always been our number one goal".

111.     According to Altice CEO Dexter Goei, "Our fundamental drive is to get more wallet-share and mind-share from our customers."  That "fundamental drive" has nothing to do with keeping customers connected and everything to do with increasing the amount they pay.

112.     Another high priority was to cut costs, even at the expense of keeping customers connected to what they love.

113.    Example 9:  Suddenlink claims to offer services "without a contract" and to have "thrown out contracts".

114.    Suddenlink simultaneously harbors the covert claim that all customers are bound by at least 7 but possibly 50 unsigned, lengthy, self-contradictory, hard-to-find, internet-posted, ever-changing, take-it-or-leave-it "agreements".

115.    Example 10:  The Suddenlink adhesion contract states that:

> If You initiate an arbitration, You will be responsible for paying a portion of the arbitration fees as follows: If You are seeking claims of $1,000 or less, Your share of the fees will be capped at $100, and If you are seeking claims of between $1,001-$10,000, Your share of such fees will be capped at $200.  **If You are seeking claims of more than $10,000, the filing, administrative and arbitrator fees will be allocated in accordance with the AAA rules.**

Citation to the provision is impossible because section numbers were removed.  It used to be § 24(f) (bold added).

116.    The AAA Consumer Arbitration Rules, however, state that the filing fee for an individual is capped at $200 and the business must pay the administrative and arbitrator fees.  AAA Consumer Arbitration Rules, *Costs of Arbitration* at pp. 33-39 (available at https://adr.org/sites/default/files_/Consumer_Rules_Web_2.pdf).  The AAA Consumer Arbitration Rules place no limitation on amount.  Thus, if a claim over $10,000 is filed and "the filing, administrative and arbitrator fees" are "allocated in accordance with the AAA rules", the consumer will still only pay the $200 filing fee.

117.    The *Costs of Arbitration* were Amended and Effective November 1, 2020, *id.* at 1, and Suddenlink changed the arbitration fee language in October 2021, so the chilling threat of allocating "filing, administrative and arbitrator fees" was drafted when the *Costs of Arbitration* had been in effect for nearly a year, and did not provide for any allocation based on a claim in excess of $10,000.

118.     Such a threat would clearly dissuade a consumer from filing a claim in excess of $10,000.

119.     Each of the misrepresentations listed in this section constitutes false advertising under W.V. Code § 32A-1-2 and an unfair or deceptive practice under § 46A-6-101 *et seq*.

## IV.     CLASS ACTION

120.     Plaintiff brings this case on behalf of herself and as a class action under Fed. R. Civ. P. 23(b)(2) and 23(b)(3) on behalf of all members of the following Statewide Class: All West Virginia customers of Suddenlink Video Service, Phone Service, and High Speed Internet Service from January 1, 2016 to the present.

121.     Plaintiff reserves the right to amend the definition of the Classes if discovery or further investigation reveals that the class should be expanded or otherwise modified.

122.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). Thousands of Suddenlink customers have experienced damages caused by Suddenlink's inadequate provision of services.  Individual joinder of all Class members is impracticable.

123.     The Class is ascertainable because its members can be readily identified using customer information. Plaintiffs anticipate providing appropriate notice to the certified Class, in compliance with Fed. R. Civ. P. 23(c)(1)(2)(A) and/or (B), to be approved by the Court after class certification or pursuant to court order under Fed. R. Civ. P. 23(d).

124.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because questions of law and fact that have common answers that are the same for the Class predominate over questions affecting only individual Class members. These include, without limitation, the following:

a.     The enforceability of the Suddenlink adhesion contract;

      b.     Defendants' conduct in providing Phone Service, High Speed Internet Service, and Video Service; and

      c.     Whether the findings of fact from the Order are accurate and adequate to give rise to the causes of action set forth herein.

125.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiff's claims are typical of the claims of the Class members and arise from the same course of conduct by Defendants. The relief Plaintiff seeks is typical of the relief sought for the absent Class members.

126.    Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex class actions.

127.    Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor counsel have interests adverse to those of the Class.

128.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(1) because the prosecution of separate actions by the individual Class members on the claims asserted herein would create a risk of inconsistent or varying adjudications for individual Class members, which would establish incompatible standards of conduct for Defendants; and because adjudication with respect to individual Class members would, as a practical matter, be dispositive of the interests of other Class members, or impair substantially or impede their ability to protect their interests.

129.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because Defendants have acted and refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive and/or corresponding declaratory relief with respect to each Class member.

130.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3) because a class action is superior to other available methods for the fair and efficient adjudication of this

controversy. The common questions of law and fact regarding Defendants' conduct and responsibility predominate over any questions affecting only individual Class members.

131.    No Class member has initiated an action against Defendants. Should those Class members bring additional actions against Defendants, the burden imposed on the judicial system by such individual litigation would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A) and Fed. R. Civ. P. 23(b)(3)(B).

132.    No judicial forum understands the provision of services to residents of this judicial district better than the Southern District of West Virginia, making the concentration of claims in this judicial district ideal under Fed. R. Civ. P. 23(b)(3)(C).

133.    The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class member than would piecemeal litigation. Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the court, and the public of class treatment in this court, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

134.    Plaintiff is not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Fed. R. Civ. P. 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiff or on its own determination, certify nationwide, statewide and/or multistate classes for claims sharing common legal questions; utilize the provisions of Fed. R. Civ. P. 23(c)(4) to certify any particular

claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Fed. R. Civ. P. 23(c)(5) to divide any Class into subclasses.

135.    The undersigned counsel for Plaintiff and the Class request that this Court appoint them to serve as Class counsel; first on an interim basis and then on a permanent basis pursuant to Fed. R. Civ. P. 23(g). Undersigned counsel will fairly and adequately represent the interests of the Class, have identified or investigated the Class' potential claims, are experienced in handling class actions, other complex litigation, and claims of the type asserted in this action, know the applicable law, will commit sufficient resources to represent the Class, and are best able to represent the Class.

136.    No alternative to this class action exists. If Defendants' substandard services persist, West Virginia residents will continue to suffer unabated harm. For injunctive relief to be effective, Defendants' services must improve.

## COUNT I
### (Negligence, Gross Negligence, Reckless and Willful Conduct)

137.    Plaintiff incorporates by reference the allegations contained in this Complaint's preceding paragraphs.

138.    The elements of a negligence cause of action under West Virginia law are: (a) the existence of a duty; (b) the breach of that duty; (c) loss or damage to another caused by the breach; and (d) actual loss or damage to another.  Gross negligence and reckless and willful conduct under West Virginia law involve the same elements but different degrees of awareness or likelihood of loss or damage.

139.    Defendants owed a duty of care to the Plaintiff and the Class, including but not limited to taking steps to provide reliable and consistent: (a) high speed internet, phone, and video service; (b) repair service; (c) call centers; and (d) speed testing.

140.    Defendants engaged in a misinformation campaign that grossly misrepresented the reliability and consistency of their services.

141.    The paragraphs above are replete with allegations that demonstrate Defendants' extreme recklessness in providing high speed internet, phone, and video service.

142.    These failures violated Defendants' duty of care to Plaintiff and the Class.

143.    As a direct and proximate result of Defendants' negligence, gross negligence and willful and reckless conduct, Plaintiff and the Class have suffered and will continue to suffer harm and are entitled to damages in an amount that exceeds the sum or value of $75,000.

### COUNT II
### (Declaratory Judgment / Unenforceable Contract)

144.    Plaintiff incorporates by reference the allegations contained in this Complaint's preceding paragraphs.

145.    An actual controversy exists between Defendants and Plaintiff concerning the enforceability of the Suddenlink adhesion contract.

146.    Pursuant to 28 U.S.C. § 2201, this Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

147.    Plaintiff seeks a declaration that the Suddenlink adhesion contract is an unenforceable contract of adhesion.

148.    Plaintiff seeks a declaration that the Suddenlink adhesion contract's restrictions on bringing a lawsuit, having a jury trial, and/or class action status are unenforceable.

149.    Plaintiff seeks a declaration that the Suddenlink adhesion contract's restrictions on obtaining relief that benefits other customers are unenforceable.  As an example, a Suddenlink customer and putative class member is on SSDI with an income below the poverty line.  She currently is getting 0.00 upload speed, as are her neighbors.  Many times a day, the internet disconnects for her and her neighbors.  Suddenlink has admitted that to improve service, it must run a new service line 7/10th of a mile.  However, given the unconscionable prohibition, she cannot compel Suddenlink to do something that Suddenlink admits would improve her service, because it would benefit her neighbors as well.  Further, given the unconscionable requirement for "binding arbitration on an individual basis", she and her neighbors cannot bring an arbitration as a group. She cannot afford land line service or gas to drive to doctor appointments, so she is completely dependent on Suddenlink's internet in order to receive medical care through telehealth (via Magic Jack internet phone service). Suddenlink's unreliable internet service continually drops her calls, disrupts her telehealth services, and negatively impacts her health.  She has repeatedly raised these issues with Suddenlink, contacted numerous government agencies, and contacted a United States Senator's office, all to no avail.

150.    Plaintiff seeks a declaration the each of the Suddenlink adhesion contract provisions that this Complaint identified as unconscionable are declared void and have no effect.

151.    Plaintiff seeks a declaration that the following provisions of the Suddenlink adhesion contract (and any similar provisions) are void: "The Services provided under this Agreement are solely for Customer's personal, residential use and Customer shall not use Services for any commercial purpose. Suddenlink shall have the right to determine, in its sole discretion, what constitutes a "commercial" purpose."  SA 11(a).  "Customer may not use the High Speed Internet Service for commercial or business purposes." AT 10.  Aside from the fact that Suddenlink

could deem anything a "commercial" purpose, the following examples of frequent internet, video, and phone use illustrate the absurdity of the provision:

a.     Buying and selling items on Craigslist.org;

b.     Viewing an advertisement;

c.     Speaking to a telemarketer;

d.     Purchasing a product, service, or video;

e.     Hiring a professional such as an architect; or

f.     Working from home during a pandemic.

## COUNT III
### (Unjust Enrichment / Quasi Contract)

152.    Plaintiff incorporates by reference the allegations contained in this Complaint's preceding paragraphs.

153.    West Virginia recognizes two types of unjust enrichment claims.  The elements of one type of unjust enrichment claim under West Virginia law are: (a) a payee received money to which he was not entitled and (b) that the payment was the result of a mistake.  A mistake for which equity will give relief is defined as some unintentional act, omission or error arising from unconsciousness, ignorance, forgetfulness, imposition or misplaced confidences.  In addition, whenever the legal title to property, real or personal, has been obtained through actual fraud, misrepresentations, concealments, or through undue influence, duress, taking advantage of one's weakness or necessities, or through any other similar circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust on the property thus acquired in favor of the one who is truly and equitably entitled to the same, although he may never perhaps have had any legal estate therein.

154.    Defendants accepted payment from Plaintiff and the Class for providing high speed internet, phone, and video service.

155.    Defendants have failed to provide such service equivalent in value to the payments received from Plaintiff and the Class.

156.    Defendants received payments to which they were not entitled based on Plaintiff's and the Class' mistaken belief that Defendants provided actual high speed internet, phone, and video service.

157.    Further, Defendants obtained payments through actual fraud, misrepresentations, concealments, or through undue influence, duress, taking advantage of customers' weakness or necessities, or through any other similar circumstances which render it unconscientious for Defendants to retain the payments.

**COUNT IV**
**(West Virginia Consumer Credit and Protection Act)**

158.    Plaintiff incorporates by reference the allegations contained in this Complaint's preceding paragraphs.

159.    Plaintiff is a consumer within the meaning of Article 6 of the West Virginia Consumer Credit and Protection Act, *W. Va. Code* § 46A-6-102.

160.    Suddenlink engages in trade or commerce within the meaning of Article 6 of the Act, *W. Va. Code* § 46A-6-102(6), by advertising, offering for sale, selling, and distributing services within West Virginia and affecting West Virginia consumers.

161.    Suddenlink has engaged in repeated violations of Article 6 of the West Virginia Consumer Credit and Protection Act by:

a.    Advertising, offering for sale, and selling a service for which customers, including Plaintiff, could not receive anywhere near the purported benefits;

b.   Misrepresenting the availability of its services;

c.   Misrepresenting the speeds of its High Speed Internet Service at the time of sale to customers, including Plaintiff;

d.   Continuing to misrepresent the speeds of its High Speed Internet Service to customers on its website;

e.   Omitting or failing to provide material information about the quality of its services to customers, including Plaintiff;

f.   Engaging in conduct that created a likelihood of confusion and misunderstanding among customers such as Plaintiff; and

g.   Incorporating unconscionable terms and conditions into the Suddenlink adhesion contract.

162.   Consistent with West Virginia Code § 46A-5-108, Plaintiff informed Defendants of the violations in writing and by certified mail, return receipt requested, and provided Defendants thirty days to make a cure offer.  As detailed previously, Defendants failed to respond until after Plaintiff filed an arbitration demand.

163.   As a direct, proximate, and legal result of Suddenlink's violation of the West Virginia Consumer Credit and Protection Act, Plaintiff and the Class have suffered damages.

164.   Plaintiff has a right to a jury trial under W. Va. Code § 46A-6-106.

165.   Plaintiff is entitled to reasonable attorneys' fees, filing fees, and reasonable costs of the action under W. Va. Code § 47-18-9.

**COUNT V**
**(Fraud)**

166.   Plaintiff incorporates by reference the allegations contained in this Complaint's preceding paragraphs.

167.    Suddenlink intentionally, knowingly, fraudulently, and with an intent to deceive Plaintiff materially misrepresented the availability, quality, and speed of its services at the time of initial purchase and through to the present.

168.    Suddenlink knew that Plaintiff would rely on the fraudulent misrepresentations.

169.    Plaintiff reasonably and justifiably relied on the fraudulent misrepresentations.

170.    As a direct, proximate, and legal result of Suddenlink's fraudulent misconduct, Plaintiff has suffered damages.

**COUNT VI**
**(Negligent Misrepresentation)**

171.    Plaintiff incorporates by reference the allegations contained in this Complaint's preceding paragraphs.

172.    Plaintiff and Suddenlink have a special or privity-like relationship imposing a duty on Suddenlink to provide correct information to Plaintiff about Suddenlink's services.

173.    Suddenlink has provided information about the availability, quality, and speed of its services that was and is incorrect.

174.    Suddenlink knew that Plaintiff would rely on the incorrect information.

175.    Plaintiff reasonably and justifiably relied on the incorrect information.

176.    As a direct, proximate, and legal result of Suddenlink's negligent misconduct, Plaintiff has suffered damages.

**COUNT VII**
**(Breach of Contract)**

177.    Plaintiff incorporates by reference the allegations contained in this Complaint's preceding paragraphs.

- 43 -

178.     Assuming the Suddenlink adhesion contract is valid and enforceable, Plaintiff and Suddenlink entered into a contract, called a Residential Services Agreement, whereby Suddenlink agreed to provide services in exchange for payments from Plaintiff.

179.     Plaintiff performed all of her obligations under the contract.

180.     Assuming Suddenlink has obligations under the contract – which would be a prerequisite to determining an enforceable contract exists – Suddenlink failed to perform its obligations to Plaintiff.

181.     As a direct, proximate, and legal result of Suddenlink's breach of contract, Plaintiff has suffered damages.

**COUNT VIII**
**WV Code §46A-6-109: Incomprehensible Terms**

182.     Plaintiff incorporates by reference the allegations contained in this Complaint's preceding paragraphs.

183.     Under WV Code §46A-6-109(a): "Every written agreement entered into by a consumer … for the purchase or lease of goods or services in consumer transactions … must: (1) Be written in a clear and coherent manner, using words with common and everyday meanings; (2) use type of an easily readable size and ink which adequately contrasts with the paper; and (3) be appropriately organized and captioned by its various sections to be easily understood.

184.     The Residential Services Agreement: (a) is not written in a clear and coherent manner, using words with common and everyday meanings, as demonstrated by the statement by Lena Mehendale, whose SAT results indicate she has some of the highest possible reading comprehension skills, and by statistics provided by the Tri-State Literacy Council; (b) Are often not on paper as required, when on paper do not use type of an easily readable size, when on the website use a color font that does not adequately contrast with the white background; and  (c) Are

not appropriately organized and captioned by their various sections to be easily understood, indeed, the section numbers have been removed, no doubt to make it harder to cite and find in litigation or arbitration.

185.    Plaintiff requests that the Terms be changed or written in a manner to conform with WV Code §46A-6-109.

186.    Plaintiff is entitled to reasonable attorneys' fees, filing fees, and reasonable costs of the action under W. Va. Code § 47-18-9.

187.    Plaintiff has a right to a jury trial under W. Va. Code § 46A-6-106.

**COUNT IX**
**WV Code §46A-6-107: Warranty on Goods**

188.    Plaintiff incorporates by reference the allegations contained in this Complaint's preceding paragraphs.

189.    WV Code §46A-6-107(a) provides that "with respect to goods which are the subject of or are intended to become the subject of a consumer transaction, no merchant may: (1) Exclude, modify, or otherwise attempt to limit any warranty, express, or implied, including the warranties of merchantability and fitness for a particular purpose; or (2) Exclude, modify or attempt to limit any remedy provided by law, including the measure of damages available, for a breach of warranty, express, or implied."

190.    The Suddenlink adhesion contract states that: "Optimum makes no warranties, with respect to Equipment or Service provided by Optimum or with respect to the Equipment's compatibility with any Subscriber Equipment."  Citation to the provision is impossible because section numbers were removed.

191.    The Suddenlink adhesion contract states that:   "**the Services, Software and Equipment are provided by Optimum on an "AS IS" and "AS AVAILABLE" basis without**

- 45 -

**warranties of any kind, either express or implied".** Citation to the provision is impossible because section numbers were removed.

192.     The Suddenlink adhesion contract states that: "Optimum assumes no liability for any program, services, content or information distributed on or through the Services, Optimum Equipment or the cable system, unless locally provided by Optimum, and Optimum expressly disclaims any responsibility or liability for your use thereof."   Citation to the provision is impossible because section numbers were removed.

193.     Suddenlink / Optimum is in violation of both parts of WV Code §46A-6-107(a) in attempting to exclude, modify, or otherwise attempt to limit the equipment warranty and in attempting to exclude, modify or attempt to limit any remedy provided by law for a breach of warranty, express, or implied.

194.     Plaintiff is entitled to reasonable attorneys' fees, filing fees, and reasonable costs of the action under W. Va. Code § 47-18-9 and 15 U.S.C.A. § 2310(d)(2).

195.     Plaintiff has a right to a jury trial under W. Va. Code § 46A-6-106.

**COUNT X**
**Violation of 47 U.S.C. § 201, *et seq.***

196.     Plaintiff incorporates by reference the allegations contained in this Complaint's preceding paragraphs.

197.     Suddenlink / Optimum is a common carrier engaged in interstate or foreign communication by wire or radio.

198.     Suddenlink / Optimum has the duty to furnish such communication service upon reasonable request therefor.  Client has made such a request.

199.    Suddenlink's / Optimum's charges, practices, classifications, and regulations for and in connection with their communication services are unjust or unreasonable, and therefore unlawful under 47 U.S.C. § 201.

200.    Suddenlink / Optimum in violation of 47 U.S.C. § 202 has given undue or unreasonable preference or advantage to particular persons, classes of persons, and localities, and has subjected particular persons, classes of persons, and localities to undue and unreasonable prejudice and disadvantage.  Specifically, those persons, classes of persons, and localities under the Suddenlink footprint received vastly inferior service as compared to those persons, classes of persons, and localities under the Optimum footprint.

201.    As extensively demonstrated in this Complaint, those persons, classes of persons, and localities under the Suddenlink footprint are exploited, insulted, and damaged while being treated with the utmost disdain and contempt.  Examples abound, but a few will be repeated here:

a.    Suddenlink's attitude and behavior at the Commission hearing, including when Suddenlink's executive management team demonstrated that they had no interest in what the Commission, the Cities, the Kanawha County Commission, the Consumer Advocate Division, and Commission Staff had to say about Suddenlink's performance in West Virginia, that Suddenlink did not care to mount a serious defense to very serious allegations, and that Suddenlink witnesses showed little empathy for the suffering caused to Suddenlink customers;

b.    Suddenlink's unwillingness to provide anything but the most abysmal service despite the proven ability to be ruthlessly efficient in cutting off service when not paid;

  c. Altice CEO Dexter Goei's 2017 pledge to keep "turning the screws a little more" on cost cutting despite the fact that further cost reductions would severely impair service in the Suddenlink footprint; and

  d. The assessment of Commission Staff that "Suddenlink operates in West Virginia as if it has no regulatory or contractual obligations."

  e. Suddenlink's incompetent and uncaring effort to repair or install service in the Suddenlink footprint.  *See e.g.,* Staff Br. at 43 (describing how Suddenlink left an 84-year-old gentleman with a history of strokes and extreme dizziness without phone and other service for 11 days).

202. In violation of 47 U.S.C. § 203(b, c), Suddenlink / Optimum without notice to the Federal Communications Commission and to the public has made changes in the charges, classifications, regulations, or practices that have been filed and published, and Suddenlink / Optimum routinely charge, demand, collect, or receive a greater or less or different compensation for their services than set forth in their schedules.

203. Plaintiff has sustained damages as a consequence of these Suddenlink / Optimum violations.  Under 47 U.S.C. § 206, Suddenlink / Optimum is liable to the person or persons injured for the full amount of damages sustained in consequence of any such violation, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case.

204. Under 47 U.S.C. § 207, any person claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the Federal Communications Commission or may bring suit for the recovery of the damages for which such common carrier may be liable in any district court of the United States of competent jurisdiction.  Plaintiff elects

to pursue recovery in a forum of competent jurisdiction and has not made complaint to the Federal Communications Commission.

## COUNT XI
## Conversion

205.    Plaintiff incorporates by reference the allegations contained in this Complaint's preceding paragraphs.

206.    Suddenlink, by continuing to accept payments and encouraging Plaintiff to pay, knowingly and intentionally took payments from Plaintiff with the intent to permanently deprive Plaintiff of money with no intent to pay it back or provide the value that Plaintiff expected from the payments.

207.    With the acceptance of each payment, Suddenlink committed a distinct act of dominion wrongfully exerted over the property of Plaintiff in denial of Plaintiff's rights or inconsistent therewith.

208.    As a direct, legal, and proximate cause of Suddenlink's actions, Plaintiff has suffered damages.

## COUNT XII
## Outrage / Emotional Distress

209.    Plaintiff incorporates by reference the allegations contained in this Complaint's preceding paragraphs.

210.    Suddenlink's conduct was  and  is  atrocious,  intolerable,  and  so  extreme and outrageous as to exceed the bounds of decency.

211.    Suddenlink either acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from its conduct.

212.    Suddenlink's actions caused Plaintiff to suffer emotional distress.

213.    The emotional distress Plaintiff suffered was so severe that no reasonable person could be expected to endure it.

214.    As a direct, proximate, and legal result of Suddenlink's infliction of emotional distress, Plaintiff has suffered damages.

**COUNT XIII**
**NYGBS § 349**
**(Against Cebridge Acquisition, LLC and Altice USA)**

215.    Plaintiff incorporates by reference the allegations contained in this Complaint's preceding paragraphs.

216.    Cebridge Acquisition, LLC and Altice USA are located in and engaged in these deceptive trade practices in the conduct of business, trade or commerce and in the furnishing of service in the state of New York.

217.    Plaintiff has been injured by reason of Cebridge Acquisition, LLC's and Altice USA's violation of NYGBS § 349, and brings an action in Plaintiff's own name to enjoin such unlawful act or practice and to recover the actual damages or fifty dollars, whichever is greater. Plaintiff further requests that the award of damages increase to an amount not to exceed three times the actual damages up to one thousand dollars, because Cebridge Acquisition, LLC and Altice USA willfully or knowingly violated NYGBS § 349.

218.    Plaintiff also requests reasonable attorneys' fees.

**COUNT XIV**
**W.V. Code § 47-18-4 West Virginia Antitrust Act ("WVATA")**

219.    Plaintiff incorporates by reference the allegations contained in this Complaint's preceding paragraphs.

220.     As is evident from this Amended Complaint's preceding paragraphs, Suddenlink possesses monopoly power across the Suddenlink footprint in West Virginia.

221.     As is evident from this Amended Complaint's preceding paragraphs, Altice, N.A. willfully acquired that monopoly power in order to exploit it through ruthless cost cutting that degraded the service Suddenlink customers so desperately needed.

222.     As is evident from this Amended Complaint's preceding paragraphs, Suddenlink willfully maintains that monopoly power to charge inflated prices for inferior services.

223.     As is evident from this Amended Complaint's preceding paragraphs, Suddenlink does not provide "simply superior products" and Altice, N.A.'s acquisition of Suddenlink, which was ultimately transferred to Altice USA, was no historical accident, but an intentional scheme to acquire and abuse monopoly power.

224.     Plaintiff's business or property has been injured by reason of Suddenlink's violations and Plaintiff is entitled to recover threefold the damages sustained, together with reasonable attorneys' fees, filing fees, and reasonable costs of the action under W. Va. Code § 47-18-9.

**COUNT XV**
**(Injunction)**

225.     Plaintiff incorporates by reference the allegations contained in this Complaint's preceding paragraphs.

226.     Plaintiff requests that this Court enter an injunction preventing Suddenlink from:

a.       Utilizing any equipment that is past EOL;

b.       Utilizing inexperienced or inadequately trained employees and/or contractors to perform repairs, configurations, maintenance, and service calls;

   c.  Hiring the Altice Technical Service Division to perform any services for Suddenlink in West Virginia whatsoever;

   d.  Routing customer calls to any call center outside the state of West Virginia;

   e.  Utilizing any mission critical equipment without N+1 redundancy;

   f.  Delivering services over lines or cables that are threatened by trees, vegetation, or other hazards;

   g.  Billing for outages in excess of 24 hours;

   h.  Charging late fees in excess of $2;

   i.  Charging late fees or terminating service on bills that were timely postmarked; and

   j.  Charging for service calls where the technician did not fully restore service.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment against Defendants and in favor of Plaintiff and that it grant the requested equitable relief; all damages permissible under law, including attorneys' fees and costs, and pre-judgment and post-judgment interest; and any further relief the Court deems just and proper.

### JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all claims and of all issues so triable.

Dated: November 20, 2023

*/s/ Dennis C. Taylor*         
Dennis C. Taylor, Bar No. 6965
Taylor Conway Price PLLC
831 Fourth Avenue, Suite 201
Huntington, West Virginia 25701
Phone: (304) 541-0332
Email: dennis@taylorconwayprice.com

Charles R. "Rusty" Webb
Bar No. 4782
The Webb Law Centre, PLLC
716 Lee St. E.
Charleston, West Virginia 25301
Phone: (304) 344-9322
Fax: (304) 344-1157
Email: rusty@rustywebb.com

Talcott J. Franklin *
TFPC, a Maine Professional Corporation
181 Western Promenade
Portland, Maine 04102
Phone: (214) 642-9191
Fax: (207) 512-1248
Email: tal@tfpc.me

* Licensed only in Maine, Michigan, North Carolina,
South Carolina (inactive), and Texas. Admitted *pro
hac vice*.